UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

UNITED STATES OF AMERICA,                    :
         -against-

                                 :                    12 Cr. 626 (ER)

GLENN THOMAS,                                        :

                Defendant,                    :
-------------------------------------------------------x


## MEMORANDUM OF LAW IN SUPPORT OF  GLENN THOMAS' MOTIONS FOR A JUDGMENT OF ACQUITTAL OR A NEW TRIAL

Attorney for Glenn Thomas
Michael H. Sporn, Esq.
Law Office of Michael H. Sporn
299 Broadway, Suite 800
New York, New York 10007
Tel. No. (212) 791-1200

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x

UNITED STATES OF AMERICA,                    :

        -against-                                   :

GLENN THOMAS,                                :

            Defendants.             :
------------------------------------------------------x

### Memorandum of Law in Support of Glenn Thomas' Motion for a Judgment of Acquittal or for a New Trial

This Memorandum of Law is respectfully submitted on behalf of Glenn Thomas in support

of his post-trial motions under Rules 29 and 33 of the Federal Rules of Criminal Procedure for a

judgment of acquittal or, alternatively, for a new trial.   As Your Honor is no doubt familiar with

the standards governing post-verdict motion practice, only a few principles directly relevant to this

motion are highlighted.   Mr. Thomas also joins in the arguments submitted by his co-defendants

to the extent applicable to him.

### The Trial, Mallory and the Burden Video

By way of background, on August 22, 2014, after a trial over three weeks, a jury convicted

Mr. Thomas of four of the six counts in the indictment: conspiring to and attempting to commit a

Hobbs Act robbery under 18 U.S.C. §1951 (Counts One and Two), murder through the use of a

firearm in relation to the robbery and robbery conspiracy under 18 U.S.C. § 924(j), and

brandishing a firearm in relation to the robbery and robbery conspiracy under 18 U.S.C. § 924(c).

The jury convicted Mr. Thomas of the 924(j) murder, but also found in Count Five (the Section

924(c) count) that while all defendants brandished firearms during the robbery, none of them were

[1]

responsible for having discharged the firearm.   The jury also acquitted Mr. Thomas of the charged

drug conspiracy (Count Three) and did not return a verdict on Count Six, which was a separate

firearms count in relation to only the Count Three drug conspiracy.   The Court denied Mr.

Thomas's oral motions for a judgment of acquittal.   Tr. at   2026-32; 2232-36.

One of the government's primary witnesses was a cooperator named Jamar Mallory, who

testified that he and a fellow-Blood member, Kevin Burden, had provided two firearms to Thomas

and Whitaker for use during the robbery.   Tr. at 431, 855, 861, 937, 956, 1184, 1416.   Both

Mallory and Burden were heavy drug users.   Late on the night of December 14, 2010, they were

drinking and smoking marijuana together at their residence, as was typical.   Tr. at 865, 957,

1199-200, 1203, 1340-41, 1560-61.   Mallory testified that late in the evening he received a phone

call from James Williams (L-1), who was sending over two men to pick up guns.   Tr. at 1206-08,

1216.   Mallory retrieved a weapon he held for L-1, a black .38 revolver, while Burden retrieved

silver or chrome revolver from Burden's relative.   Tr. at 1211-17.   Shortly thereafter, according

to Mallory, Mr. Thomas and Mr. Whitaker arrived.   Tr. at 1218.   Mr. Thomas had previously

robbed Mallory on two occasions.   Tr. at 860, 1166-67, 1417.   Mallory gave Mr. Thomas the

black .38 revolver without checking whether the gun was loaded, and Burden gave Whitaker the

other weapon, because Burden only wanted to provide a weapon to a Blood member whom he had

recruited.   Tr. at 1218-20.   Mr. Thomas tucked the weapon in his waistband and left without

saying why they wanted the guns, and Mallory did not know the reason.   Tr. at 1222-23, 1225.

Mallory did not hear from them again until a night or two later, when Mr. Thomas

purportedly returned with the gun and beer and inquired whether Mallory had heard about what

happened.   Tr. at 1229.   Mr. Thomas said he was looking for L-1 to return the gun.   Tr. At 1230.

[2]

According to Mallory, Thomas said that he and five others had robbed 54 Chambers Street, and

that there were shots fired after a violent dispute with the victims, and that Jeffrey Henry had

possibly died.   Tr. at 1231, 1233-34.   Mallory, who did not know that anyone would be shot nor

what the gun was to be used for, was unhappy that the gun was fired and argued with Mr. Thomas

about it.   He then lied to investigators when questioned shortly thereafter.   Tr. at 1236-38.

Whitaker returned independently to return the chrome gun to Burden, and complained that it did

not function.   Burden said to put the gun in his hand and then fired twice out of the window to

prove that it worked.   Tr. at 1238-42.   Mallory first said that happened after the robbery, then

corrected himself and stated that that incident occurred two days prior to the robbery at Chambers

Street, then admitted he did not know about the timeline.   Tr. at 1241, 1559.

Mallory was with Mr. Thomas when Thomas was arrested in February 2011.   Tr. at 1173,

1175, 1361-63, 1366.   Mallory began cooperating in approximately January 2012.   But he

continued to lie to the government about the Henry robbery/murder during his proffers, **and** he

was committing armed robberies of drug dealers, as well as selling and taking drugs, while he was

supposed to be cooperating.   Finally he was found out and remanded in September 2012.   Tr. at

905, 908, 1334-35, 1376, 1409, 1553-54.

On July 9, 2012, Mallory met with Burden and video recorded a conversation in a hotel

room in Newburgh "to talk to [him] about the murder."   Tr. at 1255-56.   The Government

introduced and played five excerpts from the Burden video, in which they are drinking liquor

together, and discuss the robbery.   Tr. at 1256-57, 1262, 1283-84, 1293, 1301, 1303, 1304.

Mallory prodded Burden by asking him about the robbery and named Thomas as having been

present after "refresh[ing Burden's] memory" and directing him to "think about it" and

[3]

"reminding" him.   Tr. at 1297, 1331-32.   The crux of Burden's statements on the tape was that he gave the gun(s) used in the robbery to Whitaker, Thomas or both.   He did not testify.[1]

The only other evidence against Mr. Thomas (apart from one statement from another cooperating witness, Ramone McDermott) came from the government's other cooperator, Anthony Baynes, who testified to meeting Thomas in 2009 or 2008, and to seeing him on the street perhaps once a week during that time, including in 2009.   Tr. at 700-02, 824.   Mr. Thomas, of course, was in prison for almost all of 2008, and all of 2009.   Tr. at 824.   Like Mallory, Baynes was a chronic, heavy and persistent marijuana user.   Tr. at 549-51, 613.   Also like Mallory, he was a drug dealer and had engaged in many armed robberies of drug dealers.   Tr. at 408, 626-27.

Baynes testified that on December 14, 2010, after Christian and he informed L-1 of the robbery they were planning, L-1 called someone to procure a gun for the robbery.   Tr. at 387, 394, 476.   Five minutes later, a woman arrived, whom L-1 directed to leave a purse containing a gun in the mailbox.   Tr. at 476, 769.   L-1 then called others about the robbery.   Tr. at 476.   Thomas arrived at L-1's house on Dubois Street.   Tr. at 477, 768, 772.   Baynes left but then returned to a house on Miller Street, and met with Christian, Thomas, Whitaker and the others.   Tr. at 479. They donned masks and proceeded to Chamber Street.   Tr. at 480-81.   Mr. Thomas pulled a gun as they robbed three people outside 54 Chambers Street.   Tr. at 481.   Baynes claimed that Mr. Thomas and the others entered the house while he and "Quay Quay" stayed outside.   Tr. at 482.

Baynes then entered and attempted to assist Christian, who had lost his gun and was

---

[1]Mr. Thomas moved *in limine* to exclude the Burden videotape in its entirety. ECF Documents No. 122-23.   The government opposed, and narrowed the tape to seven excerpts, eventually admitting five. At the last pre-trial conference, the Court found the relevant excerpts conditionally admissible on the extent to which the actual testimony of the cooperating witnesses matched with the government's pre-trial representation of what it would be.   Transcript at 51-52.   The transcripts are attached as Exhibit 1 (Government Exhibit 291-T at trial).

wrestling with one of the victims.   Tr. at 482-84.   Baynes was stabbed in the struggle, and Christian got away.   Tr. at 482-85.   When Baynes tried to leave, two of the others, Bash and Whitaker were struggling to open the front door.   Tr. at 485, 509.   Baynes testified that Mr. Thomas was behind them and Baynes.   Tr. at 486, 509.   Mr. Thomas came forward to assist in trying to open the door.   Tr. at 486, 509.   Mr. Thomas, Whitaker, and Bash took turns trying to open the door and sticking a gun out and shooting.   Tr. at 487, 509.   Baynes heard someone scream, and they opened the door, and went through, and Baynes saw someone shot on the other side.   Tr. at 488.   Baynes and the others fled, and Baynes returned to Quay Quay's house before going to the hospital for the stab wound.   Tr. at 489-90, 495.   In identifying himself and others on the pole camera while he was headed toward Chambers Street before the robbery and again after it while fleeing, Baynes did not identify Mr. Thomas.

At the hospital, Baynes was questioned by the police and embarked on a long series of lies about the robbery.   Baynes admittedly lied to law enforcement repeatedly about what occurred, implicating himself, Quay Quay, Christian, Bash and Baby E.   Tr. at 400, 513, 522-48, 552-53, 560-63, 634-38, 704, 776, 791-99.   The story would change as Baynes was confronted with new information that could not be reconciled with his various lies. In total, Baynes offered six or seven different versions of what occurred.

At the hospital and in other statements to law enforcement prior to May 2011, Baynes did not implicate or mention Mr. Thomas in connection with the robbery. Tr. at 561, 790.   However, Baynes also admitted to being aware that Thomas had been arrested in February 2011 (including actually seeing him in prison) before he began to implicate Mr. Thomas in the robbery for the first time in May 2011.   Tr. at 788-89, 800-01. Even so, on May 20, 2011, Baynes told investigators

[5]

that Bash or Whitaker had shot Henry, not Mr. Thomas.   Tr. at 807.   Baynes also admitted

speaking with Mallory spoke about the robbery while they were both incarcerated afterwards.   Tr.

at   709-11.   Mallory also spoke with another cooperating witness, Ramone McDermott, after

they were arrested and in prison.   Tr. at 1402.

### Discussion

The Court erred in admitting the Burden videotape.   In context, Burden's statements on

the video do not qualify as a hearsay exception contrary to Burden's penal interest under Rule

804(b)(3).   Even if they did, Mr. Thomas's confrontation rights under the Sixth Amendment and

*Crawford v. Washington*, 541 U.S. 36 (2004) were violated when he lacked the opportunity to

cross-examine Burden.   These errors, in combination with highly prejudicial testimony related to

gang membership and affiliation, denied Mr. Thomas a fair trial and require a new one.

Additionally, because the evidence against him apart from the tape was so weak and equivocal and

depended exclusively on the word of highly unreliable cooperators (even by cooperator standards),

the Court should enter a judgment of acquittal on all remaining counts.

### A.   804(b)(3)

The Court admitted Burden's hearsay statements on the tape under Rule 804(b)(3).

Whether a statement is sufficiently against the declarant's penal interest is a fact-intensive exercise

answered in context, and on a case by case basis.   *See United States v. Williams*, 506 F.3d 151,

155-56 (2d Cir. 2007) (citing authority).   More, that the statement is contrary to the declarant's

penal interest is not sufficient by itself.   Rule 804(b)(3)(B) expressly requires "corroborating

circumstances that clearly indicate [the statement's] trustworthiness[.]"   Those circumstances are

absent here, and Burden's statements are inherently unreliable.

[6]

The seminal case is *Williamson v. United States*, 512 U.S. 594, 599 (1994), which adopted a "narrow" and restrictive understanding of admissible statements under Rule 804(b)(3) and reversed the defendant's conviction because the admitted statements were far too broad and implicated more than the declarant's penal interest.   "The fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non self-incriminatory parts."   *Id.* at 599-600. "[M]ere proximity to other, self-inculpatory statements does not increase the plausibility of the self-inculpatory statement [and] the fact that a statement is collateral to a self-inculpatory statements says nothing at all about the collateral statement's reliability."   *Id.* at 600.   "A statement is not self-inculpatory because it is part of a fuller confession, and this is especially true when the statement implicates someone else."   *Id.* at 601.   Accordingly, the Rule "does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory."   *Id.* at 600-01.

"In *Williamson*'s wake, [the Second Circuit has] repeatedly emphasized that each particular hearsay statement offered under Rule 804(b)(3) must be separately parsed and must itself be self-inculpatory."   *United States v. Jackson*, 335 F.3d 170, 179 (2d Cir. 2003); *see also United States v. Sasso*, 59 F.3d 341, 349 (2d Cir. 1995) ("*Williamson* requires determination that each particular hearsay statement is self-inculpatory and does not permit admission of entire narrative on ground that a portion is self-inculpatory").   Thus, trustworthiness or reliability is a foundational requirement under Rule 804(b)(3) and goes to admissibility rather than weight. More, "the inference of trustworthiness from the proffered corroborating circumstances must be strong, not merely allowable."   *United States v. Gupta*, 747 F.3d 111, 127 (2d Cir. 2014).   It is the government as the proponent of the challenged statements that must carry its burden of

[7]

demonstrating the statement's reliability by pointing to evidence corroborative of both the truth of the statement and of Burden's trustworthiness.  *See United States v. Paulino*, 445 F.3d 211 (2nd Cir. 2006) (citing cases).

Admission of broad swathes of the Burden tape failed to comply with these principles.2 Initially, however, of the universe of Burden's statements the government introduced, only a small portion touched on his penal interest, and even that is not clear.   Some, Excerpts 2 and 5, for example, relate to Burden's purported knowledge of gang tensions or his possession of a weapon not in relation to the charged crimes against the defendants here.   Possession of a weapon is presumably contrary to his penal interest, but that was not the purpose for which the government argued the statements were admissible.

The contradictions and vacillations in Burden's statements about what he knew and did not know evince a lack of trustworthiness that should have excluded the statements, particularly as he could not be cross-examined. Burden agreed with Mallory that they were not "on point" [Excerpt 1, Tr. at 1299 (explaining that "on point" meant knowledge of what was happening)]; "We wasn't on point" [Excerpt 3]; "We didn't know nothin' was gon' no like that, bro. We ain't had no knowledge " [Excerpt 4]; "We didn't know how much niggers was rolling, tell you the truth." [Excerpt 4]; "Anything other than that, bro, niggers ain't had no knowledge of it." [Excerpt 4].   Of course, the requisite knowledge materialized when Burden subsequently pleaded to transferring firearms with knowledge that they would be used in a robbery, but he could not be confronted with

---

2 It is not apparent that Burden, who Mr. Thomas subpoenaed and was expected to invoke his Fifth Amendment privilege against self-incrimination, was unavailable to testify, a requirement for admission of the hearsay statement here.   The government could have offered Burden either use or transactional immunity under 18 U.S.C. §6002 and *Kastigar v. United States*, 406 U.S. 441 (1972), and compelled his testimony, but elected not to.   His unavailability was as much a product of the government's choice to ensure that he was not cross-examined as anything else.

prior denials.

Arguably, the only time on the tape that Burden mentioned knowing that the guns would be used for a robbery was when Burden said in Excerpt 4 that "[Mallory] just said to have the skats ready cause we was gonna get a come up just by letting niggas hold the skat. . . You like, They about, they got a jux, some nice jux lined up. That's all you told me."   But it is not clear that he was referring to the Chambers Street robbery, particularly as he later references other robberies when he lent out his gun, and where he shot it out the window in response to complaints that it did not work.   Tr. at 1314-16.   Mallory, for his part, could not say whether that incident occurred before or after the Chambers Street robbery, after initially saying it was after and then saying before.   Tr. at 1238-42, 1559.   More, on the tape, Mallory disclaims knowledge that the guns were to be used in a robbery, and testified at trial that he did not know the reason at the time, that Burden did not know either, and that Mallory did not tell Burden about any robbery. Tr. at 1222-25, 1300, 1309-10.   Mallory also testified that getting a "come up" was not necessarily in relation to a robbery.   Tr. at 1307-08.   Mallory also testified that he gave the black .38 to Mr. Thomas and that Burden gave his gun to Whitaker, but on the tape, Burden says that he gave his gun to Mallory, and Mallory gave both of them to Mr. Thomas and Whitaker.   Excerpt 4; Tr. at 1311-13.   Mallory, for his part, did not admit providing the weapons until Burden's statements on the tape.   Tr. at 1398-99.

Mallory prods and pushes Burden at multiple junctures to make statements about the events in question: "Like, think about it.   You remember, you remember who was there . . . I'm gonna refresh your memory -- it was Bow Wow, Gucci" [Excerpt 1]; "It was Bow Wow and Gucci. That's when you had um, that's when you had the chrome .38." [Excerpt 1]; "You remember after

[9]

that shit happen, you remember how Gucci was acting . . . Gucci was bragging about that shit."
[Excerpt 3];   "Remember that shit?" [Excerpt 3]; "What do you remember?" [Excerpt 3]; "Do you
remember, I didn't even know what the fuck.   I just got a call."   [Excerpt 4]; "After they did this
shit, what do you remember?" [Excerpt 4].   The extent to which Burden's statements are his own
and not implanted by Mallory are powerful illustrations of why the declarant's (Burden's)
statements lack sufficient indicia of reliability, and should have by itself excluded admission of the
tape.   More, Mallory admitted that they were smoking marijuana and drinking on the night in
question, and that they were drinking again during the recorded conversation.

Worse, the statements that inculpated Mr. Thomas as participating in the robbery while
using a firearm are inherently less reliable - because Burden was not present for the robbery and
only would have learned of it second-hand - than the statement that Burden gave him a firearm for
some purpose for which Burden at least had personal knowledge.   *See United States v. Saget*, 377
F.3d 223, 230 (2d Cir. 2004) (noting that reliability under Rule 804(b)(3) enhanced where
circumstances indicate that those portions of the statement that inculpate the defendant are no less
reliable than the self-inculpatory parts of the statement). Thus, Burden's belief as to whether or not
his statements were true does not make them inherently accurate or reliable as to what occurred.
*See Brown v. Keane*, 355 F.3d 82, 89 (2d Cir. 2004) (anonymous 911 call violated confrontation
clause because caller did not have personal knowledge of events purporting to describe); *United
States v. Lang*, 589 F.3d 92 (2d Cir. 1978) ("Although Rule 804(b)(3) does not expressly
incorporate requirement that declarant have personal knowledge of facts to which statement
relates, requirement of firsthand knowledge has always been inherent in statement against interest
exception and is assured by Rule 602").

[10]

Burden did not bother to "minimize his culpability" because he did not sufficiently implicate it in the first place, or at the least not in the way the government has suggested.   Further, in disavowing knowledge of what the defendants were planning or how and in what circumstances they intended to use the gun, Burden *was* minimizing his culpability, particularly in light of his subsequent guilty plea under Section 924(h) to transferring a firearm with the *knowledge* that it would be used to commit the robbery. *See Jackson*, 335 F.3d at 179 (affirming exclusion of defendant's proffer of co-conspirator's plea allocution for failing to comply with *Williamson* because not sufficiently self-inculpatory); *cf. Williams*, 506 F.3d at 156 (no error in admitting Rule804(b)(3) statement where declarant was "boastful" and made no effort to minimize his own culpability and spoke of an "equal role" in charged murders).   Not only were Burden's recorded statements not reliable, it is difficult to conceive of how they could have been any more *unreliable*. *See United States v. Tropeano*, 252 F.3d 653, 659-60 (2d Cir. 2001) (abuse of discretion to permit portion of co-conspirator's plea allocution that he conspired with more than one person because it lacked independent guarantees of trustworthiness).

The touchstone of the rule is the belief that reasonable people generally do not inculpate themselves unless they believe the assertion to be true.   *See Williamson*, 512 U.S. at 599.   But it strains credulity to say that Burden – the man who purportedly shot a gun out the window to prove it worked - was a reasonable person, especially as his credibility or *bona fides* depend, more than others, on being sufficiently boastful of crimes he may or may not have committed.   Directing others to put a loaded gun to one's hand or head, and then shooting it out the window twice are not actions of a reasonable person.   Tr. at 1314-16.   Further, the government argued about Burden's status as a high-ranking member of the Bloods (Tr. at 2166-67), but a member of a violent street

[11]

gang might well exaggerate his own criminality or not recount it accurately, especially as advancement and reputation depend on a perceived willingness to commit violent crimes.   *E.g.* 18 U.S.C. §1959 (murder in aid of racketeering).   "(A) reasonable person in the declarant's position" is an inherent contradiction in terms.   A reasonable person would not be in Kevin "Kev Gotti" Burden's position.    No one would accuse him of being reasonable.    In light of Burden's statements themselves, the circumstances under which they were made, and all other surrounding circumstances, they lacked sufficient reliability or trustworthiness and should not have been admitted.    The error was compounded by the inability to conduct cross-examination and the violation of Mr. Thomas' confrontation rights.

**B.**    **Confrontation Issue**

If a trial is the search for truth, and cross-examination is the greatest engine devised to discover the truth, it subverts the process to allow the government to shield declarants from the rigor and scrutiny of cross-examination merely by engineering statements to a confidential informant, and then not calling the declarant as a trial witness.

We acknowledge the Second Circuit's decision in *Saget*, but do not believe it is controlling on these facts.    *Saget* distilled a conception of "testimonial" as a "declarant's knowing responses to structured questioning in an investigative environment or a courtroom setting where the declarant would reasonably expect that his or her responses might be used in future judicial proceedings." 377 F.3d at 228.   That case dealt with a co-conspirator's admissions to a friend who turned out to be a confidential government informant, and the court appeared to hinge the "testimonial" determination on the declarant's expectation or awareness that the statement would be used at a later proceeding.   *Id.* at 228-29.   But *Saget* only reached its determination that the

[12]

statements were not testimonial under *Crawford* after noting that the statement qualified as a

co-conspirator statement under *Bourjaily*.3   *See id.; see also United States v. Farhane*, 645 F.3d

132, 162-63 (2d Cir. 2011) (rejecting *Crawford* challenge to admission of co-defendant's recorded

conversations with confidential informant where statements concerned future intention to wage

*Jihad*, and provide material support, and were intended to cajole or persuade, firmly within

co-conspirator exception under Rule 801(d)).

      In fact there are occasions, we would argue such as this, where the declarant's expectations

or awareness that the statements will be used later are not as relevant to the testimonial inquiry.

*See United States v. Burden*, 600 F.3d 204, 223 (2d Cir. 2010) (citing cases).   The Second Circuit

has repeatedly endorsed a test that examines the declarant's purpose in making the statements at

issue.   *See id.* at 224-25 (noting that confidential informant's purpose in recorded statements was

"attempting to elicit statements from others, anything he said was meant not as an accusation in its

right but as bait" and thus not testimonial because not for the purpose of accusing); *United States v.*

*James*, 712 F.3d 79, 95 (2d Cir. 2012) (statement is testimonial when made with the primary

purpose of creating a record for use at a later criminal trial).

      Thus, to the extent that the declarant's purpose in making the statement is important,

Burden's purpose was prosecutorial even if he did not realize it, because the statement was

manufactured under the auspices of the government.   Mallory admitted that the purpose of the

meeting with Burden was to engage him in discussions about the night of the robbery and the

associated events, as the government instructed.   Tr. at 1324-25.   The Court should not simply

---

3 Whereas such statements might not be thought testimonial because they were made in furtherance of the conspiracy, Burden made his statements only after the conspiracy ended, and only constituted "idle chatter" in any event.   By definition then, they were not in the scope of or in furtherance of the conspiracy. *Crawford* intimated that a co-conspirator statement may not be testimonial for purposes of the rule it announced, but no such issue exists here.

[13]

ignore the circumstances under which the statement came to be uttered.   Burden's statements implicating Mr. Thomas were made for the purpose of accusing, even if his intent was not prosecutorial.   They were made for the purpose of establishing the fact of Mr. Thomas's participation in the robbery with the weapon furnished by Malllory and Burden.

   *Crawford* noted that testimony concerns statements "made for the purpose of establishing or proving some fact."   541 U.S. at 51; *see also Davis v. Washington*, 547 U.S. 813, 822 (2006) (recognizing that declarants make testimonial statements to "prove past events").   Later cases have engrafted language to "prove some fact at trial".   *See Melendez-Diaz v. Massachusetts*, 557 U.S. 309, 324 (2009).   Burden made the taped statements to establish the events in question not "at trial," but to Mallory for their own idiosyncratic purposes, but they are no less accusatory because they were uttered to an acquaintance in a hotel room while drinking than to a jury in a courtroom, or because Burden was not, morally or legally seeking to hold Mr. Thomas accountable.

   The cases appear to rely on the contradictory premise that responding to the prompts of a confidential informant is different in kind from making a similar statement in a formal, police interrogation, and is inherently less reliable.   On the one hand, declarations against interest are thought reliable even though made in informal or casual settings or contexts.   On the other hand, such statements are thought *insufficiently* reliable to qualify as testimony because they lack the solemnity or formality of sworn, in-court questioning.   It is perverse that Burden's admissions were not solemn or formal enough to be considered testimonial (and thus outside the orbit of *Crawford*), yet were somehow reliable enough as an adverse declaration to be admissible without any opportunity for cross-examination.   Thus, if they were more formalized or made under oath,

[14]

then Mr. Thomas would have been entitled to cross-examine Burden, but was unable to do so because the statement *lacked* such formality.   This paradox is bizarre, and these are the precise kinds of statements that are most in need of cross-examination to ensure their reliability.

The whole point of *Crawford* was that confrontation trumps firmly rooted hearsay exceptions, and that reliability is assessed through the procedural guarantee of cross-examination rather than whether it was thought sufficiently reliable as a hearsay exception or otherwise.   As reliability remains the touchstone, Burden's statements are no more reliable because he made them to a confidential informant and not to law enforcement, and are inherently less reliable because he was not cross-examined on them.   Worse, idle chatter between purported co-conspirators is notoriously unreliable, the street equivalent of locker-room braggadocio.   Burden was no less a witness against Mr. Thomas merely because his statements did not meet some vague, ill-defined and highly fallible definition of "testimonial," and no less a witness against Mr. Thomas merely because his confessor was a government informant rather than a government agent.

Responses to police interrogations are testimonial, *see James*, 712 F.3d at 88 (quoting *Crawford*), but why would the government bother to interrogate Burden when they could just as easily send Mallory as a proxy instead, and then admit Burden's un-cross-examined statements? This creates perverse incentives, and the declarant's expectations or purpose when making the statements should therefore not be determinative as to whether the statement is testimonial where the government is the prime mover behind eliciting, recording, and preserving the statement. Irrespective of whether Burden anticipated that his statements to Mallory would be used for prosecutorial purposes, they were obtained and uttered because the government wished them to be uttered for use in an investigation and prosecution.   The confrontation right should not be so

[15]

easily circumvented.

The Supreme Court has disapproved of instances where the government uses "an undercover agent to circumvent the Sixth Amendment right to counsel." *United States v. Jacques*, 684 F.3d 324 (2d Cir. 2012) (citing *Illinois v. Perkins* 496 U.S. 292, 299 (1990)). We see this principle in *Massiah v. United States*, 377 U.S. 201 (1964) and *United States v. Henry*, 447 U.S. 264 (1980 ). The statements at issue in *Massiah* and *Henry* were no more admissible merely because the defendant made the admission to an informant and not directly to government agents. That is, the identity or status of the interrogator was immaterial. *Massiah* and its progeny establish that whether the "interrogator" is a law enforcement officer or a confidential informant is a distinction without a functional difference. The Government violates a defendant's right to counsel and against self-incrimination when it employs "secret interrogation by investigatory techniques that are the equivalent of direct police interrogation." *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986).

Similarly, there is no valid reason that should be so for purposes of the right to counsel under the Sixth Amendment but not for the right to confrontation, or why it is permissible to use an undercover agent to circumvent confrontation rights. Burden's statements were just as "deliberately elicited" [*see Massiah*, 377 U.S. at 206] as Massiah's or Henry's, and Mallory's prompting of Burden's inculpatory statements was the equivalent of an interrogation, whether it occurred surreptitiously in a hotel room as Burden was plied with liquor, or in the overt formality of a law enforcement interview. Mallory deliberately initiated and "stimulated" the exchange in order to "elicit" incriminating information as instructed, both as to Burden and others. He was no less a tool of the police as the jailhouse informant in *Messiah* and *Henry*. *See Henry*, 477 U.S. at

[16]

273; *Maine v. Mouton*, 474 U.S. 159 (1985); *cf. Kuhlmann*, 477 U.S. at 459 (finding no *Massiah* violation where informant merely 'listened" to "spontaneous" and "unsolicited" statements).   The right to counsel would be a meaningless abstraction without the concrete right for that counsel to confront and cross-examine adverse witnesses.

Relatedly, but no less troubling, are the implications under *Bruton v. United States*, 391 U.S. 123 (1968).   The government avoided *Bruton* simply because Burden pleaded guilty and was not a joint trial defendant with Mr. Thomas, Whitaker and Christian. But again, it is perverse that the statement implicating the trial defendants was admissible with Burden absent from the trial, but would have been inadmissible under *Bruton* if Burden had been a co-defendant at a joint trial.

Permitting the government the play the video and for the jurors to hear what Burden "told" them [Tr. at 2200-03] is effectively to permit the creation of "a third category of witnesses, helpful to the prosecution, but somehow immune from confrontation" - a category the Supreme Court in *Melendez-Diaz* rejected as non-existent.   *See* 129 S. Ct. at 2534.   The limitations of *Crawford*, *Bruton*, and Rule 804(b)(3) can create a toxic brew when a non-testifying co-defendant makes admissions to a confidential informant that implicates a trial defendant, and then pleads guilty.

## C.    Prejudice and Harmless Error

In recent years, the Second Circuit has disapproved of the government's efforts at circumventing the hearsay prohibition and the confrontation clause through manufactured inculpatory testimony in lieu of cross-examination of the declarant, or otherwise using a narrow hearsay provision to admit a much broader and damaging statement.   *See United States v. Gomez*, 617 F.3d 88 (2d Cir. 2010) (reversing because police officer testified about co-defendant's actions in surreptitiously calling defendant in a way that made apparent the co-defendant's hearsay

[17]

statement that defendant was his supplier). "The government was able to convey [the co-defendant] statements on the central question of this criminal prosecution (through the testimony of a police officer, no less) without producing [the co-defendant] himself at trial." *See id.*   The court was disturbed because on the core issue, the government placed an "unimpeachable accusation before the jury" without any opportunity of adversarial testing or confrontation. *See id.*; *see also United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008) (reversing and disapproving of introduction of gang members' incriminating out of court statements under the guise of purported expert in gang structure who was present during interrogations); *United States v. Al-Moayad*, 545 F.3d 139, 166-72 (2d Cir. 2008) (reversing material support conviction where government admitted "without limitation" highly inculpatory and prejudicial notes of confidential informant who the Government did not call at trial [the defense called him instead] as substantive evidence and prior consistent statements, not merely to rehabilitate).

Here, the Burden tape pushed the government's case, otherwise reliant wholly as to Mr. Thomas on the word of the impeached cooperators, from weak and equivocal to a conviction. Other, less inherently unreliable witnesses testified that a crime was committed, but only the testimony of the cooperators and confidential informant tended to connect Mr. Thomas to those offenses.   And for the most part, the government's exhibits did not tend to prove Mr. Thomas' guilt, and often did not even suggest it.   The government recognized the importance of the Burden tape to its case, and therefore relied on it heavily and repeatedly during its summation and rebuttal, arguing that it corroborated the cooperators' testimony: "[W]e all know, because you saw it in the video that L-1 called Jamar [Mallory] for the gun."   Tr. at 2167-69 (noting that "all the other evidence [the videotape] supports" that Baynes told the government that L-1 called Mallory to

[18]

procure firearms), 2171-75, 2200-02; 2384 (describing the Burden video as "unvarnished evidence of what happened").    It played Excerpt 4 during the primary summation, and played the tape *again* two more times during the rebuttal.    Tr. at 2200, 2385, 2387.

The government argued that Burden was more credible than Baynes or Mallory precisely because he was *not* a cooperating witness, and thus "had no incentive to lie. No incentive to say anything other than what was true.    You heard from one of their co-conspirators.[4]    You heard from Kev Gotti."  Tr. 2172. 2200-01. In other words, Burden was more credible and his testimony on the tape more reliable because he was not subjected to cross-examination like Mallory or Baynes.    The government argued that "just in case [the jury] felt uncomfortable relying on Jamar Mallory, which you shouldn't because everything he said is corroborated, you have Kevin Burden."  Tr. at 2201.    "[Y]ou know you can believe [Mallory] because Kev Gotti, not a cooperator, no cooperation agreement, *told you*." (emphasis supplied)  Tr. at 2202.    These sorts of arguments almost by definition preclude harmless error.

The government attempted to bootstrap the credibility of cooperating witnesses by repeated references to Burden's recorded statement to Mallory.    This was the product of circular reasoning.    Mallory lied to the government about the robbery and his role in providing weapons when he began cooperating in January of 2012.    Tr. at 1388, 1391.    He did not admit providing the weapon himself until Burden;s statement on the recording that Mallory did so.    Tr. at 1398-99.

_____

[4]  Before trial, the government conceded that Burden=s statements on the videotape were not admissible under Rule 801(d)(2)(E) as co-conspirator statements under *Bourjaily*.  Arguing that Burden=s taped statements were reliable because he was a co-conspirator contravenes the spirit, if not the letter, of that argument, and seeks to make precisely the argument that should have been foreclosed and unavailable to the government: that Burden's statements were inherently reliable because they were co-conspirator statements made during and in furtherance of the conspiracy - even as they were made after the conspiracy ended, not in furtherance of it, nor in its scope.    Burden's status as a co-conspirator should not buttress his reliability.

[19]

In other words, after attempting to get Burden to discuss the robbery as instructed (Tr. at 1324-25), Mallory simply conformed his testimony to the Burden video – making it meaningless to argue, as the government did, that their statements are reliable because they are consistent with each other.

How can the government seriously argue that Burden's statements were not testimonial such that he was not a "witness" against the defendants when the government argues in closing about what Burden "told you [the jury]?" *See also* Tr. at 2203 (arguing that McDermott's testimony "lined up with things that Gotti told you.").   The government was not making a rhetorical point but was plainly admitting the testimonial nature of Burden's taped statements. The tape thus had the effect of bolstering Mallory's (and by extension Baynes') testimony with a degree of reliability or credibility that it did not possess otherwise, as the government admitted its cooperators were liars and storytellers [Tr. at 2382] and caused derivative prejudice insofar as it lent greater credence to their testimony.   *See United States v. Forrester*, 60 F.3d 52, 66 (2d Cir. 1995) (noting how prejudice stemming from evidentiary errors is aggravated by effect on other testimony in the case).

After less than an hour of deliberations, the jury requested the transcripts of Anthony Baynes' testimony on one trial day, and then clarified shortly thereafter that it wished for almost the entirety of the trial transcript: the complete testimony of Baynes, Jamar Mallory, Terrence Smith, Danielle Williams, Akinto Boone, David Evans, and Ramone McDermott, as well as transcripts of the Burden tapes (although the transcripts themselves were not evidence) and the 911 call.   Tr. at 2481-82.   The next morning, the jury received the Baynes and Mallory transcripts (or at least some of them), viewed the Burden video, and then resumed deliberations as the parties were preparing the remainder of the transcripts in light of necessary redactions.    Tr. at 2490.

[20]

However, after hearing and seeing the Burden tape, the jury did not even bother to wait for the other transcripts it requested, and instead returned a verdict just a few hours after it resumed deliberations.   Tr. at 2490-91.

The jury's acquittals on the drug conspiracy and associated firearms count, which the government argued was supported by ample testimony of the cooperating witnesses [Tr. at 2223-28], is proof positive that the word of the cooperators, uncorroborated by the Burden tape, was not sufficient to find guilt beyond a reasonable doubt.   Even more so, before the case was submitted to the jury, the government maximized its chances for guilty verdicts on Counts Three and Six by removing the (b)(1)(A) charge as to quantity, and proceeding solely under (b)(1)(C), which of course requires no finding as to weight.   Tr. at 2032-33.   Thus, it cannot be argued that the acquittals had anything to do with insufficient findings as to quantity, as it plainly was the *quality* of the proof offered by the cooperators.

Even if there were little doubt as to Mr. Thomas' guilt - which is decidedly *not* the case here - the gravity of the error in admitting the Burden tapes requires a new trial.   *See United States v. Forrester*, 60 F.3d 52, 65 (2d Cir. 1995) ("Even if an appellate court is without doubt that a defendant is guilty, there must be a reversal if the error is sufficiently serious.").   The magnitude of the error, its centrality to the case against Mr. Thomas, the otherwise equivocal, questionable and contradictory evidence against him, the government's reliance on the tapes as "devastating" evidence in its closing arguments [Tr. at 2384[5]], combined with the inability to even question

---

[5] In counsel's experience, prosecutors frequently use the term "devastating" to comment on their favorite evidence, but the Burden video is the *only* piece of evidence that the government described as "devastating" in either of its closing arguments.   And in case the jury might consider it only *qualifiedly devastating*, the government clarified that it was "absolutely devastating."   Tr. at 2384.   Evidently there was some hyperbole, but the government plainly recognized the value of the videotape to its case.

[21]

Burden, all compel the conclusion that admission of the tapes was not harmless.   The court cannot be certain with any reasonable degree of confidence that the improper admission of the tapes did not influence the jury's consideration.[6]   *See United States v. Kaplan*, 490 F.3d at 122 (error is harmless where "unimportant in relation to everything else the jury considered on the issue in question"); *Forrester*, 60 F.3d at 65-66 (reversing because hearsay declarant's statement "went to the critical issue at trial" and were "unfairly prejudicial . . . impart[ing] a powerful message that [the defendant] was guilty").   That conclusion is buttressed by the jury's express request to listen to the tapes a second time and their verdict closely thereafter.   *See Al-Moayad*, 545 F.3d at 170-72 (evidentiary error not harmless where it buttressed testimony of witness with impeached credibility, was central to defendants' guilt and went "to the heart of the case," evidence of guilt was not otherwise overwhelming or sufficient to dispel reasonable doubt, and was relied on heavily by the government in closing arguments) (citing cases).

To compound matters, while the trial was rendered fundamentally unfair by admission of the Burden videotape, it was made manifestly more unfair by constant and persistent references to gang membership, structure and hierarchy in a case where membership in the Bloods or the existence of it was not a charged crime nor an element of any charged offense or RICO enterprise or conspiracy, nor was the crime inextricably bound up in any meaningful way with gang motivations.

Evidence of gang membership may be relevant to some limited extent to show how the

_____

[6] While evidentiary errors that infringe on a constitutional right - including the Sixth Amendment right to confront one's accusers - are reviewed to determine whether the error was harmless beyond a reasonable doubt, *see United States v. Reifler*, 446 F.3d 65, 86-87 (2d Cir. 2006); *United States v. Harvey*, 991 F.2d 981, 996-97 (2d Cir. 1993), reversal is necessary whether Mr. Thomas receives the benefit of a heightened standard for constitutional claims, or the more typical harmless error analysis for non-constitutional claims outlined in *Al-Moayad*, 545 F.3d at 164 and *Kaplan*, 490 F.3d at 122-23.

defendants came together, but the record was saturated with evidence relating to the Bloods and associated acts of violence and other gangs or "sets," which ensured that the defendants were thoroughly prejudiced by their association with the Bloods, raising the intolerable specter that Mr. Thomas was convicted merely for association with unsavory characters who do bad things rather than on the strength of the evidence against him. *See United States v. Molton*, F.3d , (7th Cir. 2014) (noting that "gang affiliation evidence must be handled with care, because a jury is likely to associate gangs with criminal activity and deviant behavior, raising the specter of guilt by association or a verdict influenced by emotion") (internal citations omitted); *United States v. Farmer*, 583 F.3d 131 (2d Cir. 2009).

### Conclusion

A reasonable doubt cannot be extinguished when the evidence is as consistent with innocence as with guilt, and is equivocal, modest, contradictory or attenuated.  *See, e.g., United States v. Coplan*, 703 F.3d 46, 69, 72 (2d Cir. 2012) (reversing convictions because evidence with respect to defendants' intent when considered against the conspiracy as a whole, "remains, at best, in equipoise"*); United States v. Cassese*, 428 F.3d 92, 98-103 (2d Cir. 2005) (affirming judgment of acquittal because totality of evidence was as consistent with innocence as with guilt); *United States v. Glenn*, 312 F.3d 58, 69-70 (2d Cir. 2002) (reversing murder conviction because evidence, viewed in its entirety, did not prove guilt beyond a reasonable doubt and was as consistent with innocence as with guilt).   Without the Burden tape, the evidence in this case is inherently suspect and a judgment of acquittal should be entered.

The Court's discretion under Rule 33 to order a new trial is broad, *see United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001); *United States v. Autori*, 212 F.3d 105, 120-21 (2d Cir.

[23]

2000), and unlike a motion for a judgment of acquittal, the Court may resolve inferences against the government and evaluate the credibility of the government's cooperators. *See id.* Evidentiary errors that are sufficiently serious and that have a substantial influence on the verdict entitle the defendant to a new trial. *See United States v. Williams*, 585 F.3d 703, 709-10 (2d Cir. 2009) (reversing denial of new trial motion because of evidentiary error where government's case was "by no means overwhelming"); *Paulino*, 445 F.3d at 216-17; *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993); *United States v. Livoti*, 25 F. Supp. 390 (S.D.N.Y. 1998).   In the alternative, a new trial should be granted pursuant to Rule 33.

Dated:   January 26, 2015
         New York, New York

Michael H. Sporn

[24]