**MICHAEL H. SPORN**
ATTORNEY AT LAW
299 BROADWAY
NEW YORK, NEW YORK 10007

TELEPHONE
(212) 791-1200

FACSIMILE
(212) 791-3047

April 10, 2015

**BY ECF**

Hon. Edgardo Ramos
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

                Re:   <u>United States v. Glenn Thomas</u>
                      Ind. No. 12-Cr-626 (ER)

Dear Judge Ramos:

      This letter-brief is respectfully submitted on behalf of Glenn Thomas in reply to the Government's opposition to Mr. Thomas' post-trial motions, filed on March 27, 2015. Rather than respond to each of the Government's assertions, Mr. Thomas will focus on only a few and will rely for the most part on our original brief filed in January. As before, Mr. Thomas joins in full in the arguments of his co-defendants, including in any reply submissions.

      1.      <u>Framing the Discussion</u>

      The government begins by describing the strength and quality of its evidence, but virtually none of the evidence that the government cites, except the Burden videotape, implicates Mr. Thomas one way or the other. While it would be difficult to argue that the Government at trial did not prove that a crime was committed, its proof with respect to Mr. Thomas' participation was far more circumscribed and hardly "overwhelming" (at page 2). Elsewhere, the government recounts the testimony of other witnesses (at page 5, 9) to prove conduct for which Mr. Thomas was acquitted, a drug conspiracy and related possession of firearms, which has little relevance as to the counts of which he was convicted. The impressive-sounding catalogue of 8 different categories of evidence or testimony, as well as the 18 different witnesses (at page 2, 6, 9), are far less salient to Mr. Thomas' guilt because apart from the Burden video, only the testimony of two cooperating witnesses, Jamar Mallory and Anthony Baynes, affirmatively connects Mr. Thomas to the events in question. In context therefore, it is somewhat disingenuous to fault Mr. Thomas for not "identify[ing] any particular weakness in the Government's evidence," (at page 11) because aside from the Burden video and Mallory and Baynes' testimony, there was none to identify or attack.

The case against Glenn Thomas rises or falls with the cooperating witnesses who implicate him. One of those cooperators, Anthony Baynes, told so many different stories about the robbery and who was involved (discussed in Mr. Thomas' January brief at pages 5-6 with accompanying transcript cites), that it beggars belief to find that a jury could have been convinced beyond a reasonable doubt by Baynes alone. The other cooperator, Jamar Mallory, also had an extensive history of lying to the authorities about this incident (and otherwise), did not recount a version of events that matched Burden's even once Mallory began to purportedly be truthful, was a chronic drug and alcohol user, was arrested with Mr. Thomas, and did not offer the version of events to which he testified at trial (purportedly corroborating Burden's taped statements) until *after* recording the conversation with Burden in July 2012. *See* Thomas' January Brief at 3, 19-20 with accompanying transcript cites.

The government blithely observes (at page 12-13) that credibility of witnesses is within the jury's province, yet ignores how it bootstrapped Mallory's credibility through the device of the Burden tapes. The jury should never have been in the position of assessing Mallory's credibility by reference to how consistent his testimony was with the statements on the Burden videotape. Conversely, Burden's statements were no more reliable merely because they were echoed later on by Mallory. The tape was used to bolster Mallory, and Mallory was used to bolster the tape, but each was improperly bootstrapped to one another to furnish a patina of reliability that neither possessed independently. Because admission of the Burden videotape was so critical to the government's case against Mr. Thomas, he was amply prejudiced as a result of allowing the jury to see and listen to it. The jury itself told us how important the Burden tape was when it returned verdicts without bothering to wait for the read back of testimony it requested, but after it reviewed the tapes again during deliberation.

2. The Burden Videotape Was Inadmissible Under Rule 804(b)(3)

The government suggests that certain of Burden's statements are contrary to his penal interests, but does so only by reference to the other evidence adduced at trial and to the larger set of facts, including Burden's subsequent guilty plea to knowingly transferring the firearms with the knowledge that they would be used to commit a felony. The proper analysis is whether the statements are incriminating on their face at the time and in the context in which they were uttered -- not whether they can be understood as contrary to the declarant's penal interest when considered against the larger backdrop of the proceedings, or whether subsequent developments can furnish the requisite inculpatory spin. *Reliability* is assessed taking into account a much broader universe of facts and evidence, but that same approach is impermissible at the threshold level to determining whether the statements are sufficiently adverse to the declarant's penal interest or whether he would have reasonably understood them as such. That the government, well after trial, is able to string together a plausible theory of why Burden's statements are contrary to his penal interest does not indicate that they in fact were so at the time, or that they are now inherently reliable and credible.

The government attempts to cast Burden's incoherent ravings in Excerpt 2, for example (at page 23-25), as contrary to his interest because they purport to illustrate his association with the Bloods or at least knowledge of Blood politics, and because some reference to the Bloods structure

was of marginal relevance in how the defendants came together, but neither of those two reasons explains why Burden's statements were actually self-incriminating.[1]

Furthermore, that the statements in question require some relationship to the charged crime (beyond being merely incriminatory in the abstract) is implicit in why they are sufficiently relevant to be admissible in the first instance. Otherwise, the declarant would, in substance, be permitted to provide a descriptive narrative of the criminal acts of others, which is what occurred here, while only vaguely inculpating himself. Thus, the government's argument that the penal interest in question need only be general and not relate to the charged crime is unavailing.

Even the most inculpatory portions of the recording in Excerpt 4, in which Burden appears to have *some* knowledge of how the two firearms were to be used are largely contradicted or brought into question by other portions of the recording in which Burden (and Mallory) disclaimed any concrete knowledge of the robbery. *See* Thomas' January Brief at 8-9. It is not that Burden or Mallory needed to be cognizant of every detail of the robbery, but Burden's statements are too equivocal or incoherent to demonstrate with any reasonable degree of confidence that they were truly against his penal interest or that he understood them as such. Even at the trial, Mallory did not admit to genuine knowledge of the purpose of the firearms or that they would be used in the robbery at 54 Chambers Street. Tr. at 1222-25. Furthermore, that there was a factual basis for Burden's subsequent guilty plea does not mean that the statements on the tape eighteen months prior were either contrary to his penal interest or inherently reliable or trustworthy.

But even if the government were correct that certain of Burden's statements on the recording were sufficiently contrary to his penal interests as to be admissible under Rule 804(b)(3), those statements constitute only a small portion of the larger universe of recorded statements that were admitted and played for the jury. Similarly, that the government offered only portions or excerpts of the longer conversation between Burden and Mallory does not mean that those statements were adequately parsed.

On the one hand, the government alleges a "misunderstanding" on the defendants' part (at page 26-27) in our application of Rule 804(b) by focusing on Mallory's reliability and not the veracity of Burden's statements. But the government recognized repeatedly (at page 15, 18-19, 30-33) that the truthfulness of Burden's statements was measured in large part by Mallory's trial testimony and that the extent to which they were consistent served to corroborate Burden. In any event, this ignores the extent to which Mallory was responsible for and engineered Burden's statements. Mallory's "'incentives to lie, or to shift blame, or to otherwise taint Burden' (at page 26) are the very context to judge the "corroborating circumstances" supporting Burden's trustworthiness" (at page 27). Far more than in other cases, the reliability of Burden's statements depends on the circumstances under which they came to be made. Mallory's machinations are part and parcel of those circumstances.

---

1 The Government significantly overstates (at 16, 23-24) the extent to which membership in or association with the Bloods played a role in the events it attempted to prove at trial. Involvement with the Bloods was marginally relevant in proving how the events and defendants came together, and was therefore admissible to a limited degree. But the government draws a false narrative of events as purely Bloods-inspired or Bloods-related, which does not come close to justifying the extent to which the government and its cooperators saturated the record with persistent and unnecessary references to gang membership.

The reliability of both Mallory and Burden is bound up together, and both are fundamentally broken. For the reasons argued in Mr. Thomas' earlier papers, Mallory is far too suspect to provide independent corroboration of Burden's trustworthiness. Two broken cigarettes taken together are still two broken cigarettes. Relatedly, the Government accuses Mr. Thomas and his co-defendants of being selective in when to credit and when to disregard Mallory's and Baynes' testimony (at page 32-33), but it misses the larger point that the entire account is not reliable and should not believed, not that one cooperator's version is inherently more truthful than another's or should be credited over another.

Lastly, whether the substance Burden smokes on the video is marijuana or tobacco, and whether he drinks enough alcohol to become intoxicated prior to making the statements that the government introduced (at page 27) does not change the fact that Mallory admitted that both he and Burden were habitual and heavy users of marijuana, drugs and alcohol and in fact had indulged on the night that Messrs. Thomas and Whitaker purportedly retrieved the two firearms. Surely the government is not suggesting these facts have no bearing on the inherent trustworthiness of what Burden remembered 18 months before.

### 3. The Jury's Special Verdict on Discharge Requires Dismissal of Count Four

The government does not engage in substance on the firearms argument (raised in co-defendant Christian's brief, but joined by Mr. Thomas), preferring to argue in general terms that arguments based on inconsistent verdicts are non-cognizable. If the argument here were a garden variety claim about inconsistent verdicts, then the Government's opposition would have more traction. *See, e.g., United States v. Mitchell*, 146 F.3d 1338, 1342-45 (11th Cir. 1998) (rejecting appellant's claim that jury's acquittal on 924(c) charge compelled reversal of conviction for armed bank robbery under Section 2113(d)). However, what the government ignores is that the 924(c) violation - the brandishing but *not* the discharge of a firearm during the robbery - is a constituent component of the greater 924(j) offense in a way that is not the case for most other offenses.

One crime specifically references and relies upon the commission of another. The interplay between the two statutes is well-founded, and Section 924(j) is essentially an aggravated version of Section 924(c). *See United States v. Parkes*, 497 F.3d 220, 234 (2d Cir. 2007) (noting that one is a lesser included offense of the other); *United States v. Medina*, 2014 U.S. Dist. LEXIS 91751, at *8 (S.D.N.Y. Jul. 7, 2014). The government cannot prove the latter without having sufficiently proved the former. Elsewhere, the same government has argued that in order to convict a defendant on the 924(j) aggravated count, the jury "must determine that a defendant has violated Section 924(c)'s core offense." Brief for the United States in Opposition to Petition for a Writ of Certiorari in *Berrios v. United States*[2], at 10. The sentence on the "aggravated" offense is "legally authorized only if the elements set forth in Section 924(c) are proved." *Id.* at 10-11.

The two offenses are hardly strangers to each other for purposes of inconsistent verdicts, as the government here would seem to argue. The jury's verdict on the 924(c) count thus means that the government did not succeed, as a matter of law, of proving Mr. Thomas' guilt on the 924(j) offense, which must be vacated. Contrary to the government's arguments, we need not speculate

---

[2] Available at www.scotusblog.com/case-files/cases/berrios-v-united-states/.

about what the jury found or why.   The policy of avoiding idle speculation cannot justify avoiding the significance of the jury's finding that the government did not prove that Mr. Thomas or his co-defendants discharged a firearm or that any of them aided and abetted such a discharge.   The plain implication is not merely an inconsistency, but an insufficiency in the government's proof of Mr. Thomas' violation of Section 924(j).

The language of the statute, as always, is important: whoever "*in the course of a violation of subsection (c)*, causes the death of a person through the use of a firearm, shall" be punished accordingly.   18 U.S.C. § 924(j) (emphasis added).   A violation of Section 924(j) requires proof (1) of an underlying crime of violence or drug crime; (2) that during or in relation to that offense the defendant used or carried a firearm; and (3) that in the course of using the firearm the defendant committed a murder.   *See United States v. Wallace*, 447 F.3d 184, 187 (2d Cir. 2006).   Mr. Thomas is not attempting to use the fact of a jury finding on one element to preclude a contrary finding on another.   Instead, he is arguing that in the course of Mr. Thomas's brandishing of the firearm during the robbery, he did not cause Mr. Henry's death through use of that firearm.   That conclusion is only buttressed by the physical evidence.   The medical examiner testified that Mr. Henry was killed with .9mm bullets, which could not have been discharged from the weapon that Mallory purportedly gave to Mr. Thomas, a black .38 revolver.   Tr. at 292-93, 302, 379.

18 U.S.C. § 1111, the generalized statute in the criminal code that proscribes murder, makes clear that a killing in the course of a robbery qualifies as murder because participation in the robbery (or another felony) supplies the requisite malice aforethought.   In this way, a co-defendant who participates in the robbery but does not actually fire a weapon has the requisite malice, and if death results from the robbery, is thus guilty of murder.   But Section 924(j) is not a generalized or federal felony-murder statute.   A murder committed in the perpetration of a robbery *can* serve as the basis for a Section 924(j) violation, of course, but only if the defendant actually causes (or aids and abets) the victim's death *through the use of a firearm during the course of his violation of Section 924(c)*.   Thus, if Mr. Henry were a federal officer, or if he was killed within the special maritime or territorial jurisdiction of the United States, then the government would have had a basis to charge the defendants - including those who did not actually discharge a firearm - with felony-murder under 18 U.S.C. §§ 1111(a) and 1114.   *Cf. United States v. Thomas*, 34 F.3d 44, 48-49 (2d Cir. 1994) (affirming conviction of all conspirators for murder of undercover DEA officer during botched robbery under Sections 1111 and 1114, not under 924(j)).

Otherwise, the element of causing the death through the use of a firearm is rendered a nullity, an outcome that violates core interpretive canons.   *See Corley v. United States* 556 U.S. 303, 314 (2009) (cautioning that a statute should be construed to give effect to all its provisions so that none are superfluous, void, insignificant or inoperative); *United States v. Banki*, 685 F.3d 99, 110 (2d Cir. 2011).   Participation in the robbery may make a defendant liable for a killing that results from the robbery, but does not furnish adequate proof that the defendant's use of a firearm which the jury found was not proven to have been discharged, actually caused the victim's death.

Aiding and abetting liability can attach as well, but the government has not even identified, let alone proven, who the principal was that Mr. Thomas aided and abetted.   Where the government is obliged to prove every element beyond a reasonable doubt, it does not suffice for

the government to say that because *someone* must have shot Mr. Henry, and because Mr. Thomas was proven to have been present, he is responsible for aiding and abetting *whomever* was responsible for shooting Mr. Henry. In any event, the Court instructed the jury that for purposes of the special interrogatory, it could find a discharge either because that individual defendant discharged a firearm *or because he aided and abetted the discharge of the firearm.* Tr. 2443. Thus, the jury's finding that the government did not prove that Mr. Thomas discharged a firearm necessarily includes as well the finding that the government did not prove that he aided and abetted someone else's discharge.

For these reasons, the Court should reverse and vacate Mr. Thomas' conviction on all counts, or, in the alternative on the Count Four conviction charging Mr. Henry's murder with a firearm.

Respectfully submitted,

/s
Michael H. Sporn

Cc:   Andrew Bauer, Esq.